Good morning, Your Honor. I'm John R. Knight for the appellants. What we'd like to ask the Court to do is, because we have Amici on both sides, if the Court would permit us to have the parties argue first and the Amici second, I would like to take eight minutes of my ten minutes for my opening, reserving two for rebuttal. Mr. Attaway, on behalf of our Amici, would take five minutes. That's fine. Put eight on the clock. Okay. Thank you, Your Honor. And may it please the Court, again, I am John R. Knight on behalf of the appellants. The complaint in this case alleges that the Appellee's Stock Borrow Program creates phantom electronic shares of security. This case comes before the Court in review of an order granting a Rule 12b-6 motion, and so we have to take as true the allegation that the program creates the phantom security. Now, the Stock Borrow Program was designed to deal with temporary fails to deliver. Temporary fails to deliver. And that is, in fact, how the program is described on the Appellee's website to this very day, as we noted in the response to the latest Rule 28J letter filed last week. To this very day, their website describes the Stock Borrow Program as addressing temporary fails to deliver. But they know and have long known that the Stock Borrow Program actually allows fails to deliver to remain indefinitely because there's no requirement that they ever be closed out. The result of that is it creates phantom electronic securities that dilute the value of the issuer's securities and dilute the value of shareholders' ownership rights, voting, dividends, whatnot. Despite having this knowledge, the Appellees have misled investors about these effects and have omitted to tell investors and the market the truth about what really happens with these electronic securities, which are larger than the universe of underlying paper securities. To challenge this conduct, the Appellants filed a lawsuit in state court in Nevada alleging only Nevada statutory and common law claims. The defendants removed the case. Your Honors have decided that the removal on some basis gave the district court jurisdiction. The defendants moved to dismiss, and the district court dismissed the case with prejudice on grounds of both field and conflict preemption. It is our position that... You said we have decided something? What have we decided? Your Honor, we filed a motion to vacate the judgment for lack of jurisdiction in the district court. That motion was carried with the case and was denied last week or the week before. So... Right. It was subsumed in the merits, though. Yes. And so we're here to talk about the merits. In any event, the court has determined that the district court had jurisdiction, in my understanding. The district court dismissed the claim on field... I don't know that we have, but I also don't know that's before us, because you didn't seek to remand after the removal. We did not seek to remand. That's correct. And in any event, it's not before us this morning because the motion was denied by this court. The district court erred both analytically and substantively in its dismissal of this case. Analytically, it erred because there's a well-recognized preemption analysis that is required in every preemption case. And first we have to... First and foremost, we have to understand there can be no preemption unless it is the clear and manifest intent of Congress to oust state law. That is the bedrock rule. The second thing I'd like to mention is that in areas in which states have long regulated, as is certainly true in the context of the regulation of securities, there's a presumption against preemption. A presumption against preemption. Judge Thomas recently described all of this in his opinion in the Air Conditioning and Refrigeration Institute case. So there's no secret to any of this, but the district court didn't do any of it. It didn't do any preemption analysis. Instead, he relied on a case, an unpublished decision, Capici, from the Southern District of Florida. But that court also didn't do any preemption analysis. It didn't apply the presumption against preemption.  Now, if you look at this case, it just basically said there's extensive regulation of the securities industry by the Federal Government. That's enough. Field preemption, conflict preemption, case dismissed. Well, I would submit that that is not enough and is never enough. So the district court's first error in this case is that it didn't do any analysis. Now, turning to the substantive errors, first we look at field preemption. Field preemption exists only, only when the scope of Federal regulation is so pervasive, so pervasive that it is fair to infer that Congress meant to occupy the field completely to the exclusion of the States. But we know in this case that that can't be right, because in enacting the Security of Exchange Act of 1934, Congress explicitly put in a savings clause saying any rights and remedies are preserved, in addition to rights and remedies granted by the Act. That savings clause has led to over seven decades of dual State and Federal enforcement action. When Congress amended the 34 Act in 1975 to add the Section 17A, which the appellees rely on, it expressly ‑‑ I'm sorry, I shouldn't use that word, because there's no express preemption in this case. It did not change the savings clause of the ‑‑ the general savings clause of the Exchange Act in any way. It didn't change it. And in addition, it included within Section 17A a couple of provisions that explicitly give the States a role in both the clearing and settlement of securities transactions and subsequently a further amendment that gave them a role in the transfer of securities. So there is ‑‑ there's just no basis, no reason basis for finding a field preemption. Turning then to conflict preemption, there are two types of conflict preemption. One is when it's impossible to comply with both State and Federal law. The second is when the State law stands as an obstacle to achievement of the goals and purposes of the Federal statute. Now, it's a little hard to understand what the appellees are claiming in this case, but I do not understand them to be claiming that it is impossible to comply. And in fact, it is not impossible to comply. So the question then is, is there some obstacle between complying with State anti‑fraud laws and the Securities Exchange Act of 1934? Well, I would submit not. The whole purpose of the 1934 Act is full and accurate disclosure. Full and accurate disclosure. State law claims that are ‑‑ that are based on the same goal of full and accurate disclosure cannot conflict with the 1934 Act. In fact, they further the purposes of the 1934 Act. As Judge Thomas wrote in the air conditioning case, we look at the structure and the purpose of the statute as a whole. As a whole. You cannot snippet out the 17A part without the structure and purpose of the 1934 Act as a whole. When you do that, there is no conflict and, therefore, no conflict preemption. I reserve my time for rebuttal. Thank you. Mr. Attaway. You're going to take two minutes? I was going to take five. Five minutes. Go ahead. My understanding before we start. Five minutes. Go ahead. Your Honor, holding the fraud and misrepresentation based claims. Tell us who you are. I'm sorry. And who your client is. I am Scott Attaway from Washington, D.C., and my client is the North American Securities Administrators Association, which is a nonprofit organization comprised primarily of the 50 state securities regulators across the nation. And NASA's interest in this case is twofold. First, protecting defrauded investors and companies, not just these plaintiffs, but all similarly injured persons and entities. And second, preserving the applicability of state law and resisting preemption claims where Congress did not intend them to apply. Holding the fraud and misrepresentation based claims at issue here to be preempted by federal law, we think would be a huge encroachment on the powers of the states and their longstanding role in adjudicating such claims on behalf of defrauded investors. States have long protected persons and entities under common law and statutory prohibitions against misrepresentations and omissions. And those prohibitions parallel the prohibitions in federal law under Section 10b of the 1934 Act and Rule 10b-5. Which of Whistler's allegations, in your view, most clearly carved out from SEC-approved operations of the defendants here? The misrepresentation based claims, because those go to the statements and omissions that the defendants have made about their operation and effects of the stock borrow program as approved by the SEC and not the program itself. And there's no recourse in the federal scheme to redress legitimate grievances of this nature? I don't believe there's a way to get damages for past harms. I know the SEC claims that it has been incrementally addressing the problem, but that doesn't address reparations for past harm and damages. What's the misrepresentation by defendants that you claim is actionable here? The defendants basically represent that they clear trades in a way that makes the fails-to-deliver only temporary. And that's on their website, as previous counsel mentioned. Well, it seems to me, who's the misled party? It's the investing public and the issuers, especially of the small capitalization companies such as Whistler. Did Whistler do anything in reliance on that statement? Whistler, I mean, had Whistler known about this, it could have acted differently. It could have attempted to take the company public. Investors, for their part, could have decided to make other investments. But the fact is that Whistler was even aware of the representation that's attributed to defendants. At the pleading stage, I'm not sure. It seems to me that the theory is flawed. Well, the problem with this theory is it's the SEC that's supposed to have been misled and was misled by this into adopting a rule which plaintiffs don't like. But the SEC has approved the stockpile program, and you've got a specific approval by the SEC. How do you not encounter preemption problems in an effort to, in effect, try to rescind a rule the SEC has already approved? The distinction is this. The rules approved by the SEC for operation of the stockborrow program are less than three pages long, and those are in the record appellant's excerpts 176 to 178. Those rules don't address what the defendants say and don't say about the effects of the program and their operation of it after the approval. The approval came in 1983, and as we understand it, the plaintiffs allege misrepresentations and omissions occurring subsequent to that on the defendants' Web sites and the public statements they make. My understanding is that the allegations concern the fact that the defendants can't say, for example, that they cover temporary shortfalls when, in fact, these fails to deliver persist for months and even years. I don't see how that answers the question. How is it this is not something the SEC has specifically spoken to? Apparently spoke to again, I think, four years ago. This was on the news last week. They're addressing the question again currently. Their proposal is up for public comment, addressing the failures to conclude these transactions. Agencies often address problems incrementally and over time, and on a prospective basis. And these SEC efforts concern actions by the brokers, and now this proposal, as I understand it, is about actions by the investors themselves. There's nothing that I'm aware of where the SEC has looked into the actions of the clearing companies and the representations that they've made to the public about the way they operate the program and its effects. I see my time is almost up. In closing, I want to emphasize that the entrepreneurs and investors before the court have allegedly been the victims of fraud and market manipulation at the hands of the very entities that should be serving their interests, the clearing agencies that are charged with a high duty of maintaining a fair national market for clearing and settling securities transactions. Finding preemption under these circumstances would be unwarranted.  Thank you for your argument. We'll hear from the appellees at this time. Mr. Mashberg. We can have the same division. Yeah, I have nine minutes. Okay. Let her put nine on the clock. Good morning, Your Honors. My name is Greg Mashberg. I represent the appellees. I want to say at the outset that our primary basis for seeking affirmance is a conflicts preemption doctrine, and I'll concentrate my remarks this morning on that doctrine. I would note that in the appellant's initial brief, they did not argue the conflicts preemption doctrine. I'd also note at the outset that we've submitted two 28-J letters conclusing the decisions of the Supreme Court of Nevada in the now Pierce case and the Eastern District of Arkansas in the Peck quarters case. Both of those cases concerned complaints that were substantively identical to the case before this Court against the same defendants. Both cases dismissed those complaints on grounds of conflict preemption. I'd also note that my colleagues here, Mr. Knight and Mr. Attaway, are co-counsel for the plaintiffs in Peck quarters and in Nano Pierce. I think Mr. Knight set forth what the essence of his claim is accurately. He claims that there are defects, structural defects in the stock borrow program, particularly they allege that there's a creation of the phantom shares, and that these phantom shares allegedly cause damage and harm to the marketplace by depressing the value of Whistler stock, and that the defendants don't disclose these inherent defects in the program. We say that this case is really about Whistler in name only because the exact same clearance and settlement procedures that are applicable to Whistler in which they claim damages here are applicable to thousands and thousands of other companies whose stock is cleared and settled by my clients. I'm not sure that helps to say that there may be thousands of other victims. Your Honor, it helps, I believe, because it identifies this as an attack on a program as approved by the SEC, that this is not a case about the purchase and sale of Whistler securities. And, in fact, Mr. Attaway's comments about the interests of the dual State and Federal regulation of the securities industry are quite besides the point. This case is about the clearance and settlement of the nation's securities transactions under a uniform system adopted by the SEC pursuant to its congressional mandate. Does that system permit the people who operate the depository to make flat misrepresentations? Well, Your Honor, that's not actually what the allegation is in this case. The answer would be no, we can't make flat misrepresentations. But the misrepresentations that are actually alleged in this case, there's an omission part that we don't say that the program harms the marketplace. That's the omission. So you concede that some misrepresentations in the operation of the program might be actionable under State law? Not if those claims apply to functions that we perform directly pursuant to our SEC-approved rules. And that's what this case is about. The misrepresentations claims here arise out of the contents, the actual contents of the SEC-approved rules. For instance, the plaintiffs allege that we misrepresent that the program is a borrowing program when they say it's a sales program. Well, the rules themselves, and I refer the Court to Appellee's Record at 105, specifically say that it's a borrowing program, not a sales program. The reference to temporary shortfalls, the rules themselves say that borrowed shares are returned regularly, essentially the next day that the system has shares available in order to return them to the members who have, from whom they've been borrowed. And that's the Appellee's Record at 107, paragraphs 5 and 6. There's another alleged misrepresentation that the Appellee's misrepresented buy-ins are effectuated in the marketplace when, according to the appellants, buy-ins are affected through the stock borrow program. Leaving aside that the allegation is nonsensical, the rules themselves, the SEC-approved rules explicitly state that buy-ins are affected in the marketplace, and I refer the Court to Appellee's Record at 131. All the misrepresentation claims are an attack on the rules themselves, and to make the disclosures that plaintiffs are requesting would be to contradict the rules as approved by the SEC, and that would stand as an obstacle to the SEC federally approved program. The SEC has itself said, in conjunction with, I guess, the current proposal that's out for comment, that there are problems with making short sales and failures to deliver. So if the SEC is saying that is not a misrepresentation, why would it be wrong for your clients to say that? Your Honor, what the SEC is talking about in that new proposed rule in the Rule 10b deals with marketplace transactions. It deals with the purchase and sale of securities. What we're talking about in this case, most importantly, is what happens after the trade. Three days after the trade, after the investment decisions have been made, is when the shares are cleared and settled. That's when my clients come in. In the Seventh Circuit's decision in the American agricultural case, which we cite on pages 20 and 27 of our brief, made clear the distinction between a challenge under state law, otherwise valid state law, that's challenging the operations, in that case of the Chicago Board of Trade, which are preempted, as opposed to marketplace transactions. The rule that the SEC is putting out for public comment deals with the marketplace transactions where brokers are buying and selling securities. We are not buying and selling securities. We are clearing and settling securities. And state law has never had a role in litigation over misrepresentations regarding the purchase regarding the clearing and settling of securities transactions. The Petcourter's and Manopier's decisions went claim by claim in explaining why each of the causes of action in those cases were preempted. Those claims are the exact same claims that we have before this Court, and we would commend those both of those decisions to you. This one point I think should be made clear, Your Honor, is that we don't have relations with plaintiffs. We provide services for the financial institutions that are our participants. We don't have accounts for the plaintiffs. We don't have transactions with the plaintiffs. We have nothing to do with the plaintiffs. And that is why this case doesn't look like the many misrepresentation cases that this Court is well familiar with. Our preemption defense is not based upon any factual findings. This case isn't preempted because the SEC is right that these defects don't exist, and that the SEC was right when it approved these rules. The preemption, the complex preemption doctrine applies here because plaintiffs' purported application of State law, erroneous as it is, it's completely erroneous, but leave that aside for the purposes of this argument. Their application conflicts with the SEC's determination that the stock borrow program, which has been approved since 1981, satisfies Congress's requirements as set forth specifically in Section 17A of the 34 Act. Can you give us an example of a claim that would not be preempted? Sure. If there was an allegation that my clients had misappropriated trade secret information in the course of performing their functions, there's no SEC rule which would apply – SEC-approved rule which would apply to such a function. If there was an allegation that we lost somebody's property, we lost securities, or we failed to deliver securities, that wouldn't implicate any of our SEC-approved rules. Those are matters that deal with property rights. Your Honor, we do not – we do not take the position that we are immune from suit and DTCC and its subsidiaries have defended any number of actions without raising the preemption defense. But certainly in these actions, the conflicts preemption doctrine is palpable. The SEC has approved what we do as part of a uniform national program. We are clearing millions and millions of securities transactions every single day. The numbers are astounding. And Congress was clear in 1975 in Prussian in mandating a system where the SEC would oversee every facet, quote, unquote, from the Senate report, every facet of the securities handling process. Thank you very much, Your Honor. Thank you, counsel. We'll hear from Mr. Pennington. From the commission. Counsel. Thank you very much. I'm Mark Pennington, representing the Securities and Exchange Commission. The commission very much appreciates the opportunity to be heard in this important case. The first thing I'd like to say before I get to my merits is nothing that the commission has said about short-selling, making short-selling a manipulation, has ever suggested that the clearing system is implicated in any way. We're concerned, among other things, about crooks who are trying to manipulate, but there are people who would be doing the deal if it's not – I guess the question is whether the clearing system has become something of an enabler by leaving a door open for people not to close transactions. I think that is exactly the concern that the commission has. And as you said, we first adopted Regulation SHO, then we amended it to close some of the doors or the loopholes that we were concerned about. We suggested maybe we'll do some further things to reach people who may be deceiving their brokers. Not the clearing system so much, I should say. It's the requirements that people locate the security before they sell short. I don't remember anything anywhere saying that the clearing system is the problem. I'd like to talk about three points. First of all, I'd like to talk about why this appeal, as it's brought, is a direct challenge to commission-approved rules. Second of all, I'd like to talk about why there are no phantom shares. And finally, I'd like to talk about if we assume that misrepresentation claims are in the case, which is all anybody wants to talk about, why they would be preempted nevertheless. Now, first of all, the brief that an appellant files in a case defines the issues in an appeal. And the brief that was filed in this case talked only about what I call the defect claims, the claims that the system doesn't work inconsistently with state law. It doesn't say anything except one mention on page three of the brief that we even have misrepresentation claims in the case. And then they say on, like, pages 9 through 11 or 10 through 12, the defect is it causes dilution and it allows for excessive manipulation. And there's nothing about these misrepresentation claims. And that's the basis on which we filed our brief. There are no Mulligans in appellate procedure. You can't start the case over in the reply brief. And we don't even think that the misrepresentation claims are in the appeal. Second, as to the phantom shares, they claim that the court's being misled, that the commission has never said that there's phantom shares. It's only the staff, but that's not correct. When the staff puts a statement on our website saying there are no phantom shares, that's the staff. The commission authorized the brief to be filed in this court and it authorized the brief to be filed in the Nevada court. And as we explained to the Nevada court, that's a statement of the commission, just like any other official statement of the commission. This is not just a staff view. I don't want to get either of you in trouble, but it's Nevada. You know, they told me that before I went to Nevada. But I thought since I was out of Nevada, I would... We respect our neighbors to the... I apologize. There are no phantom shares. And the reason is, if you look at Article 8 of the UCC, which is a state law, it has nothing to do with the commission. I mean, it has a lot to do with the commission, but it's not a commission rule. It provides that when you own securities that are held at a broker, what you have is a securities entitlement. And that is not... That is anybody who owns shares that are held at a broker, not just when it's been a fail to deliver. That's what you have. And then the broker, in turn, has a securities entitlement on a DTC. So you could have the broker showing on DTC's books as having a million shares. And then on the broker's book, the individual person would show, say, as having a thousand shares. It's a contractual right against the broker. It's not an ownership directly in the securities. And the UCC says a broker can, if it chooses to, enter into a securities entitlement agreement, even though it doesn't have the underlying securities on deposit at DTC. It doesn't have its own securities entitlement. So you can have a contract about a thing, many contracts about one thing, without creating more of the thing. If I contracted to buy a car to be delivered in 10 days, and I turned around and entered into a contract to sell the car, and the person I sold it to sold it, and for 10 days people entered into these contracts, at the end of 10 days you could have a thousand contracts. They're not phantom cars. The markets are not confused about how many cars there are. What happens if there's a vote, a proxy vote? Or what happens if dividends are to be paid at some date when more than one person thinks they own the same share? Well, that's a different question. I mean, it's not in this case, but it is covered. The clearance system, to me, has been astonishing how complicated it is. But the broker has undertaken, when it enters into the securities entitlement, to make sure that you, as the owner of the security, get the dividend and have the vote. And that's provided for in the system. That's the way the system works. And as I say, it's a UCC idea. Well, the dividend they can take care of just by reaching into their own pocket, but the vote they can't. If you have a million shares, and a million and a half shares are out there in people's minds because of the securities entitlement and there is going to be a vote, something has to happen. Right. And all I can tell you is that's taken care of in the clearance system. It's not a claim in this case, and it's a separate obligation. It's recognized that that's an issue. And, in fact, it's a very difficult issue. The system was adopted, of course, in order to allow the transaction to happen very quickly and efficiently. And then it has these collateral effects that have to be worked out. And I can't walk you through it, but I can tell you, I can assure you, that there are provisions for it. So that's why there are no phantom shares, and they're merely alleged. You know, you can't create, you can't just allege anything. You have to have some reason and basis for it. You can look at the rules. There's no claim that they're not complying with the rules. And I think that's really returned to my third argument in the last 42 seconds, which is about the misrepresentations. The attack is that they're misrepresenting things. What they're misrepresenting is how the rules work. They're saying, as was indicated, that the commission's been fooled about these rules. So we want to impanel a jury, and we want to prove to the jury that the commission doesn't understand how these rules work. And then if the defendant should have disclosed that, and then we want you to award damages against the defendant because they've managed to fool the commission. And every judge that's looked at this case, state and federal, trial and appellate, they've all thought all of them were conflicted, conflict, preempted, except for what is the fourth claim here, or actually claims 4, 10, 14, and 18. So I thought I'd pick that. Two of the dissenters in Nevada thought that that was not preempted. And what they say there is, look, you say in your rules, paragraph 108 and 9, you say in your rules you're going to go into the market and buy. But in fact, what you do is you bar. But that's, again, the only communication. The only misrepresentation is in the rule itself. That's to say that the rule that the commission approved, if you read it, you're going to be deceived. I don't think that's possibly true. I mean, what they describe or they say is not how the rule works. But if you were, that's our problem. We have to fix that. You can't go on paneling juries in 50 states and however many trial courts there are all across the country and award damages against the nation's clearing system for performing in accordance with our rules or our approved rules. Thank you. Thank you for your argument. Rebundal. Mr. Knight. Thank you, Your Honor. I wish I had two hours instead of two minutes. But let me try to run through some of this. First of all, we're here on a 12B6 motion. You assume the truth of the averments in the complaint. The commission's disagreement with those facts is irrelevant in this context, period. Secondly, we're talking here about representations that the appellees make external to their program, to the public, on their website, in their press releases. If they speak, if they choose to speak, they have a duty to speak truthfully. I don't care what their regulations say or the rules or whatever. If they speak outside, they have to speak truthfully, and they're not doing it. Third, the SEC is working on this problem at its understandable snail's pace. And in 10 or 15 years, it may solve all this. But what good does that do Whistler? What good does that do the shareholders who are facing retrospective damages? Something forward-looking regulation isn't going to do one bit of good for them. Now, is there any federal redress? Maybe. Maybe. The claims that we're asserting, the state law claims, are essentially the same thing that Rule 10b-5 requires. It is possible, maybe, to bring a 10b-5 case. But because the claims are the state law parallels of 10b-5, we can bring them in state court. That's the plaintiff's choice. The defendants don't get to say, you can't come to state court because you have a parallel remedy to 10b-5. We get to choose. Now, the crux of all this that I've heard this morning is, the SEC has approved this. My response is, so what? When has approval ever been the sona qua non of preemption? It's not. It's not. Approval by an agency or by a statute or whatever ‑‑ may I finish my thoughts? In fact, you have about 20 seconds. Approval is a necessary condition, but it's not a sufficient condition. The fact that the SEC approved the stockpile program is irrelevant. Look at Bates v. Dow AgroSciences. In that case, the EPA approved the labels on Dow's product, but did that stop or did that disenable the plaintiffs from being able to sue on the basis that the labels were false and misleading? No. State law misrepresentation and fraud claims have never been subject to being mixed by agency approval. Okay. Reflect the Court. Thank you very much for your argument. Thank you to both sides for your arguments. This is a very interesting case, and it's submitted for decision. We'll now proceed to the last two cases on the argument calendar this morning, which were tried together in district court, but will be argued separately here. The first of these is the United States v. Medina never ends. Counsel will come forward on that.
judges: Hawkins, Thomas, Clifton